ASSOCIATION OF COMMUNITY OR-GANIZATIONS FOR REFORM NOW; Acorn Institute, Inc.; and Mhany Management, Inc., f/k/a New York Acorn Housing Company, Inc., Plaintiffs,

v.

UNITED STATES of America; Shaun Donovan, Secretary of the Department of Housing and Urban Development; Peter Orszag, Director, Office of Management and Budget; Timothy Geithner, Secretary of the Department of Treasury of the United States; Lisa P. Jackson, Administrator of the Environmental Protection Agency; Gary Locke, Secretary of Commerce; and Robert Gates, Secretary of Defense, Defendants.

No. 09–CV–4888 (NG).

United States District Court,
E.D. New York.

March 10, 2010.

Jules Lobel, Darius Charney, William Quigley, Josh Rosenthal, Center for Constitutional Rights, New York, NY, William Goodman, Julie H. Hurwitz, Goodman & Hurwitz, Detroit, MI, Arthur Z. Schwartz, Schwartz, Lichten & Bright, New York, NY, for Plaintiffs.

Peter D. Leary, Bradley H. Cohen, U.S. Dept of Justice, Washington, DC, F. Franklin Amanat, United States Attorneys Office, Brooklyn, NY, for Defendants.

### OPINION AND ORDER

GERSHON, District Judge:

Plaintiffs, the Association of Community Organizations for Reform Now, Inc. ("ACORN"), and two of its affiliates, challenge as an unconstitutional bill of attainder a group of appropriations provisions enacted by Congress that bar plaintiffs from receiving federal funding. On December 11, 2009, a preliminary injunction against the enforcement of Continuing Resolution 163, the only provision then at issue, was entered. *ACORN v. United States,* 662 F.Supp.2d 285 (E.D.N.Y.2009) (*"ACORN I"*), In an amended complaint, plaintiffs have added the remainder of the challenged 2010 appropriations provisions and have named as defendants the officials responsible for enforcing them. The parties have now agreed to consolidate plaintiffs' motions for preliminary and permanent relief and, in effect, both sides have moved for summary judgment. *See* Fed R. Civ. P. 56, 65. While there are minor disputes about factual matters, the parties agree that there are no material issues of fact that prevent resolution of this case without a trial.

As was noted in *ACORN I,* in bringing this action plaintiffs ask this court to consider the constitutionality of legislation that was approved by both houses of Congress and signed into law by the President. I again emphasize that such a task can be approached only with the utmost gravity, because legislative decisions enjoy a high presumption of legitimacy. This is particularly true where the challenge is brought under a rarely-litigated provision of the Constitution, the Bill of Attainder Clause, which has been successfully invoked only five times in the Supreme Court since the signing of the Constitution.

ACORN's critics consider it responsible for fraud, tax evasion, and election law violations, and members of Congress have argued that precluding ACORN from federal funding is necessary to protect taxpayer money. ACORN, by contrast, while acknowledging that it has made mistakes, characterizes itself as an organization dedicated to helping the poor and argues that it has been the object of a partisan attack against its mission. This case does not involve resolution of these contrasting views. It concerns only the means Congress may use to effect its goals. Nor does this case depend upon whether Congress has the right to protect the public treasury from fraud, waste, and abuse; it unquestionably does. The question here is only whether Congress has effectuated its

goals by legislatively determining ACORN's guilt and imposing punishment on ACORN in violation of the Constitution's Bill of Attainder Clause.

## BACKGROUND

ACORN describes itself as "the nation's largest community organization of low-and-moderate income families." ACORN, in addition to its own work, has affiliations with a number of other organizations, including its co-plaintiffs ACORN Institute, Inc. and MHANY Management, Inc., which was formerly known as New York ACORN Housing Company, Inc. Plaintiffs have in past years received millions of dollars in federal funding from a variety of grants, embodied in contractual agreements, from various federal agencies. ACORN itself does not receive federal grants, but it has been a frequent subcontractor of ACORN affiliates such as ACORN Institute.

Numerous accusations have been made against ACORN. Most prominently, ACORN came under attack after publication of hidden-camera videos in September of 2009, in which employees of an ACORN affiliate are seen to advise a purported prostitute and her boyfriend about how to engage in various illegal activities and evade law enforcement while doing so. Other allegations include that ACORN violated tax laws governing non-profit organizations, misused taxpayer dollars, committed voter fraud, and violated federal election laws by playing an impermissibly partisan role in its voter registration campaign. ACORN has been and is currently the subject of numerous investigations.[1] ACORN answers that it has responded by terminating staff members found to have engaged in misconduct, re-

organizing its board of directors, and hiring Scott Harshbarger, Esq., a former Massachusetts Attorney General, to conduct an internal investigation. Both sides rely on Mr. Harshbarger's report, issued on December 7, 2009, which identifies problems with ACORN's internal management, discusses reforms already being undertaken, and suggests others; it also raises issues regarding the integrity of the videotapes.

In the fall of 2009, in the absence of 2010 appropriations acts for all federal agencies and programs, Congress enacted, and President Obama signed into law, a Continuing Appropriations Resolution ("Continuing Resolution"). That Continuing Resolution included one of the provisions at issue in this case, referred to here as "Section 163" which was the subject of *ACORN I.* Continuing Appropriations Resolution, 2010, Pub.L. No. 111–68, Div. B, § 163, 123 Stat.2023, 2053 (2009). Section 163 provides that:

> None of the funds made available by this joint resolution or any prior Act may be provided to the Association of Community Organizations for Reform Now (ACORN), or any of its affiliates, subsidiaries, or allied organizations.

The Continuing Resolution containing Section 163 went into effect on October 1, 2009, and was extended on October 31, 2009 to December 18, 2009. Further Continuing Appropriations Resolution, 2010, Pub.L. No. 111–88, Div. B, § 101, 123 Stat. 2904, 2972 (2009). The extension of the Continuing Resolution was included in the same law as the 2010 appropriations act for the "Department of the Interior, Environment, and Related Agencies." Another division of this Act prohibits federal funds

---

1. The Congressional Research Service has prepared a list of all pending and previous investigations relating to ACORN. *See* Memorandum from Congressional Research Service to House Judiciary Committee re: Association of Community Organizations for Reform Now (Dec. 22, 2009).

from being "made available" under the Act to ACORN or "its subsidiaries." Dep't of the Interior, Environment and Related Agencies Appropriations Act, 2010, Pub.L. No. 111–88, Div. A, § 427, 123 Stat 2904, 2962 (2009).

On October 7, 2009, Peter Orszag, the Director of the Office of Management and Budget ("OMB") and a defendant here, issued a memorandum to the heads of all executive branch agencies regarding the implementation of Section 163 ("OMB Memorandum"). The OMB Memorandum directs, *inter alia*, that "[n]o agency or department should obligate or award any Federal funds to ACORN or any of its affiliates, subsidiaries or allied organizations (collectively 'affiliates') during the period of the [Continuing Resolution]," even where the agencies had already determined that funds should be awarded to ACORN, but had not yet entered into binding agreements with the organization to do so. This prohibition applied not just to the 2010 fiscal year, but also to appropriations made in Fiscal Year 2009, and to any funds left over from prior years' appropriations. In addition, the OMB Memorandum states that agencies should, "where permissible," suspend performance and payment under existing contracts with ACORN and its affiliates, and ask for guidance on any legal considerations from the agencies' own counsel, OMB, or the Department of Justice. Finally, turning to subcontractors, the OMB Memorandum instructs agencies to "take steps so that no Federal funds are awarded or obligated by your grantees or contractors to ACORN or its affiliates" and recommends that each agency notify federal grant and contract recipients about Section 163. On November 19, 2009, HUD gave notice to plaintiff ACORN Institute that it was suspending

several of its contracts with the organization because of Section 163.

Plaintiffs filed suit in this court on November 12, 2009, arguing that Section 163 is an unconstitutional bill of attainder and that it violates their rights under both the First Amendment and the Due Process Clause. In their initial complaint, plaintiffs alleged that, as a direct consequence of Section 163, agencies have refused to review their grant applications; that grants they were told they would receive have been rescinded; that previously-awarded grants have not been renewed; and that HUD had refused to pay on its contractual obligations even for work already performed. Plaintiffs also alleged that other organizations, such as private corporations and foundations, have cut ties to them as a result of Section 163.

Following the dissemination of the OMB Memorandum, the Department of Justice Office of Legal Counsel ("OLC") responded to a request for guidance from HUD as to whether Section 163 prohibits payments to ACORN to satisfy contractual obligations that arose prior to Section 163's enactment.[2] The OLC memorandum advises HUD that "[S]ection 163 should not be read as directing or authorizing HUD to breach a pre-existing binding contractual obligation to make payments to ACORN or its affiliates, subsidiaries, or allied organizations where doing so would give rise to contractual liability," To read Section 163 otherwise, the memorandum notes, would "undo a binding governmental contractual promise." The memorandum explains that its construction of Section 163 not only avoids abrogating "binding governmental contractual promises," but also avoids constitutional concerns, in particular those arising from the Bill of Attainder

**2.** Although the OLC memorandum is dated October 23, 2009, it was not publicly released until late November 2009.

Clause, that "may be presented by reading the statute, which applies to specific named entities, to abrogate such contracts, including even in cases where performance has already been completed but payment has not been rendered."

Plaintiffs sought emergency relief on November 13, 2009, arguing that Section 163 was an unconstitutional bill of attainder and that it violated their rights under both the First Amendment and the Due Process Clause. On December 11, 2009, I preliminarily enjoined then—defendants the United States, Peter Orszag, in his official role as Director of OMB, Shaun Donovan, in his official role as Secretary of HUD, and Timothy Geithner, in his official role as Secretary of the Treasury, from enforcing the provision, on the grounds that plaintiffs had shown irreparable harm and a likelihood of success on the merits of their claim that Section 163 is a bill of attainder.[3] *ACORN I*, 662 F.Supp.2d at 299–300.

On December 16, 2009, President Obama signed into law the 2010 Consolidated Appropriations Act. Consolidated Appropriations Act, 2010, Pub.L. No. 111–117, 123 Stat. 3034 (2009). This Act, described by the government as a "minibus" Act, is a consolidation of various appropriations acts for Fiscal Year 2010.

Several of the consolidated acts contain provisions prohibiting the award of funding to ACORN.[4] Section 418 of Division A of the Act, which appropriates funding for "Transportation, Housing and Urban Development, and Related Agencies," precludes federal funding to ACORN in language identical to that of Section 163. *See* Transportation, Housing, and Urban Development, and Related Agencies Appropriations Act, 2010, Pub.L. No. 111–117, Div. A, § 418, 123 Stat. 3034, 3112 (2009).[5] Section 534 of Division B of the Act, which covers appropriations for "Commerce, Justice, Science, and Related Agencies," provides that "[n]one of the funds made available under this Act may be distributed to the Association of Community Organizations for Reform Now (ACORN) or its subsidiaries." Commerce, Justice, Science, and Related Agencies Appropriations Act, 2010, Pub.L. No. 111–117, Div. B, § 534, 123 Stat. 3034, 3157 (2009).

Section 511 of the "Military Construction and Veterans Affairs and Related Agencies" appropriations act provides that "[n]one of the funds made available in this division or any other division in this Act may be distributed to [ACORN] or its subsidiaries." Military Construction and Veterans Affairs and Related Agencies Appropriations Act, 2010, Pub.L. No. 111–117, Div. E, § 511, 123 Stat. 3034, 3311

---

**3.** The government appealed that decision on December 16, 2009, but has not moved in the Second Circuit to expedite the appeal. By letter dated February 12, 2010, the government asked for a due date of May 13, 2010 for its opening brief in the Court of Appeals, which request was "so ordered" on February 17, 2010.

**4.** The government has identified three Fiscal Year 2010 appropriations acts passed shortly after Section 163 that do not include a ban on funding ACORN. *See* Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2010, Pub.L. No. 111–80, 123 Stat.2090

(2009); Department of Homeland Security Appropriations Act, 2010, Pub.L. No. 111–83, 123 Stat. 2142 (2009); Energy and Water Development and Related Agencies Appropriations Act, 2010, Pub.L. No. 111–85, 123 Stat. 2845 (2009).

**5.** The parties agree that Section 418's "prior Act" language bars funding of ACORN from HUD funds left over from prior years' appropriations, but disagree as to whether that language extends to other agencies' funds from prior years. Plaintiffs and the government agree that this dispute need not be resolved to decide this case.

(2009). In contrast to the other provisions in the minibus, which limit the funding prohibitions to one single division, the funding restriction in Division E applies to the entirety of the minibus, except insofar as it may conflict with other ACORN-related provisions within another division.

Following the enactment of the minibus bill, Congress passed and the President signed into law the final outstanding appropriations bill, the Department of Defense Appropriations Act of 2010, which prohibits distribution of funds under the act to ACORN or "its subsidiaries." Department of Defense Appropriations Act, Pub.L. No. 111–118, § 8123, 123 Stat. 3409, 3458 (2009). Once this final appropriations act was passed, the Continuing Resolution, and thus Section 163 included in it, expired.

On consent of the government, plaintiffs filed a second amended complaint including all five Fiscal Year 2010 appropriations provisions that prohibit funding to ACORN as well as Section 163.[6] Plaintiffs named three new defendants: Lisa P. Jackson, Administrator of the Environmental Protection Agency ("EPA"); Gary Locke, Secretary of Commerce; and Robert Gates, Secretary of Defense.

Plaintiffs and defendants agree that, for the purposes of the bill of attainder argument, the challenged provisions should be analyzed as one statute. Although several of the full year appropriations acts use language slightly different from that of Section 163, neither plaintiffs nor defendants have suggested that any of these differences is significant, either practically or legally. Similarly, although the challenged provisions differ somewhat in whether they prohibit funding to "ACORN or its subsidiaries" or "ACORN, or any of its affiliates, subsidiaries, or allied organizations," at least for plaintiffs' bill of attainder argument, any difference between these terms is immaterial. For purposes of simplicity, I refer to the group as "ACORN and its affiliates."

Plaintiffs acknowledge that HUD, pursuant to the OLC memorandum, has paid, or has agreed to pay, for work already performed under existing contracts. They contend that congressional suspension of existing contracts and the denial of the opportunity to obtain future contracts amounts to punishment that violates the Bill of Attainder Clause.

The defendants recognize that ACORN has been singled out by Congress and that there has been no judicial trial at which ACORN has been found guilty and deserving of punishment, but argue that the challenged legislation is not a bill of attainder because it does not impose punishment. The government relies heavily on Section 535 of Division B of the 2010 Consolidated Appropriations Act, which directs the United States Government Accountability Office ("GAO") to "conduct a review and audit of the Federal funds received by [ACORN] or any subsidiary or affiliate of ACORN" to determine

(1) whether any Federal funds were misused and, if so, the total amount of Federal funds involved and how such funds were misused; (2) what steps, if any, have been taken to recover any Federal funds that were misused; (3) what steps should be taken to prevent the misuse of any Federal funds; and (4) whether all necessary steps have

---

6. Following the enactment of the 2010 appropriations acts, plaintiffs had amended their initial complaint to include challenges to these acts, and they moved to "Amend/Correct/Supplement" the preliminary injunction issued in *ACORN I*. This motion was denied on procedural grounds, after which plaintiffs, on consent, filed the second amended complaint now at issue.

been taken to prevent the misuse of any Federal funds.

Commerce, Justice, Science, and Related Agencies Appropriations Act, 2010, Pub.L. No. 111–117, Div. B, § 535, 123 Stat. 3034, 3157–58 (2009). Section 535 directs that within 180 days of enactment of the Act, the Comptroller General "shall submit to Congress a report on the results of the audit ..., along with recommendations for Federal agency reforms." *Id.* Plaintiffs do not challenge the Section 535 provision as a bill of attainder, but the government relies on the investigation to argue that Congress had a non-punitive reason for passing the challenged provisions.

## DISCUSSION

### I. *Bill of Attainder Analysis*

 Article I, Section 9, of the Constitution provides that "No Bill of Attainder or ex post facto Law shall be passed." [7] A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). Enacted as a "bulwark against tyranny" by Congress, "the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *United States v. Brown,* 381 U.S. 437, 443, 442, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). This principle of separation of powers animates bill of

attainder jurisprudence; its prohibition "reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons." *Id.* at 445, 85 S.Ct. 1707.[8]

 Three factors "guide a court's determination of whether a statute directed at a named or readily identifiable party is punitive": first, "whether the challenged statute falls within the historical meaning of legislative punishment"; second, "whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes," an inquiry sometimes referred to as the "functional test"; and third, "whether the legislative record evinces a legislative intent to punish." *Consol. Edison Co. of N.Y., Inc. v. Pataki* ("*Con Ed*"), 292 F.3d 338, 350 (2d Cir. 2002) (internal quotation marks and alterations omitted). A statute "need not fit all three factors to be considered a bill of attainder; rather, those factors are the evidence that is weighed together in resolving a bill of attainder claim." *Id.*

### A. *Historical Meaning of Legislative Punishment*

 As the Second Circuit has explained, "[s]ome types of legislatively imposed harm ... are considered to be punitive per se." *Con Ed,* 292 F.3d at 351. "The classic example is death, but others include imprisonment, banishment, ... the punitive confiscation of property, and pro-

---

7. The Constitution includes two clauses prohibiting bills of attainder. Article I, Section 9, implicated here, restricts Congress; Article I, Section 10, restricts state legislatures.

8. As the government acknowledges, the Second Circuit has determined that the Bill of

Attainder Clauses protect corporations as well as individuals. *See Consol. Edison Co. of N.Y. v. Pataki,* 292 F.3d 338, 346–47 (2d Cir.2002). Defendants have reserved the right to challenge the applicability of the Bill of Attainder Clause to corporations in any appellate proceedings in this case.

hibition of designated individuals or groups from participation in specified employments or vocations." *Id.* (internal quotation marks and alterations omitted).[9]

Any consideration of the "historical" meaning of punishment in this context must begin with the handful of Supreme Court cases finding statutes to be bills of attainder. In each of the five cases in which the Supreme Court has found legislation to violate the Bill of Attainder Clause, the context of the Court's ruling was protection of political Liberty.[10] In *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866), for example, the Court concluded that a statute that barred persons from certain professions unless they took an oath that they had never been connected to an organization "inimical to the government of the United States" was punishment for past association with the Confederacy. *Accord Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866); *Pierce v. Carskadon,* 83 U.S. (16 Wall.) 234, 21 L.Ed. 276 (1872). Similarly, in *United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), the Court held that a statute making it a crime for a member of the Communist Party to serve as an officer or employee of a labor union was a bill of attainder. In the fifth case, *United States v. Lovett,* 328 U.S. 303, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), the Court held that a statute that permanently barred three government employees who had been accused of being communists from government service was an unconstitutional bill of attainder.

■ As acknowledged in *ACORN I,* the idea that the deprivation of the opportuni-ty to apply for discretionary federal funds is "punitive" within the meaning of the Bill of Attainder Clause at first blush seems implausible. Neither the Supreme Court nor the Second Circuit has been faced with such a claim. This is not surprising: Plaintiffs assert, and defendants do not dispute, that this is the first time Congress has denied federal funding to a specifically named person or organization in this way. One district court, however, in a case much like this one, has concluded that denial of the opportunity to apply for *state* government contracts amounts to punishment under Article I, Section 10. *See Fla. Youth Conservation Corps., Inc. v. Stutler,* No. 06–275, 2006 WL 1835967, at *2 (N.D.Fla. June 30, 2006). For the reasons explained below, I agree with the district court in Florida and conclude that the discretionary nature of governmental funding does not foreclose a finding that Congress has impermissibly singled out plaintiffs for punishment.

*Lovett* is particularly instructive in this regard. In *Lovett,* a congressman attacked thirty-nine specifically named government employees, including plaintiffs, as "irresponsible, unrepresentative, crackpot, radical bureaucrats," and affiliates of "communist front organizations." *Lovett,* 328 U.S. at 308–09, 66 S.Ct. 1073. Following secret hearings, Congress passed an act that no appropriation could then, or later, be used to pay plaintiffs' government salaries. *Id.* at 312–13, 66 S.Ct. 1073.

The Supreme Court concluded that the appropriations act "clearly accomplishes the punishment of named individuals without a judicial trial." *Id.* at 316, 66 S.Ct. 1073. That Congress placed the prohibi-

---

**9.** The history of the bill of attainder, and its roots in fourteenth-century England, have been described elsewhere. *See, e.g., Brown,* 381 U.S. at 441–49, 85 S.Ct. 1707; *In re Extradition of McMullen,* 989 F.2d 603, 604–06 (2d Cir.1993).

**10.** Here, plaintiffs allege that ACORN has been punished both for alleged misconduct, such as fraud, and its alleged impermissible partisanship.

tion in an *appropriations* bill carried no weight "The fact that the punishment is inflicted through the instrumentality of an Act specifically cutting off the pay of certain named individuals found guilty of disloyalty," the Court concluded, "makes it no less galling or effective than if it had been done by an Act which designated the conduct as criminal." *Id.*

The government attempts to distinguish *Lovett* on the ground that plaintiffs in that case had a "vested property interest" in their jobs, whereas here, as plaintiffs unequivocally acknowledge, they have no *right* to the award of a grant or contract from the federal government. But the Court in *Lovett* did not base its decision on a property rights analysis. The Supreme Court found a deprivation amounting to punishment under the Bill of Attainder Clause, not only because plaintiffs were deprived of their earned income from existing government jobs, but also because they were deprived of any *future opportunity* to serve the government. As the Court stated, "[t]his permanent proscription from any opportunity to serve the Government is punishment, and of a most severe type." *Id.* That plaintiffs had no right to any particular future job was of no moment.[11]

The government relies on two Supreme Court cases to argue that the denial of the opportunity to apply for federal funding cannot be punishment. In *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), the plaintiff argued that a statute denying Social Security benefits to a category of deported aliens was a bill of attainder. The Supreme Court disagreed, describing the deprivation as the "mere denial of a noncontractual government benefit" and finding no punitive intent in the design of the statute. *Id.* at 617, 80 S.Ct. 1367. The government also points to *Selective Service System v. Minnesota Public Interest Research Group* ("*Selective Service*"), 468 U.S. 841, 853, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), where the Court concluded that a statute barring persons who had not registered for the draft from federal student aid did not constitute punishment.

This case is closer to *Lovett* than to *Flemming* or *Selective Service*. The Supreme Court in both *Flemming* and *Selective Service* found the statutes at issue to be nonpunitive. In *Flemming*, the Court concluded that the legislative record "falls short of any persuasive showing that Congress was in fact concerned alone with the grounds of deportation," which, in the plaintiff's case, was prior membership in the Communist party. *Flemming*, 363 U.S. at 619, 80 S.Ct. 1367. In *Selective Service*, the Court reasoned that the statute had the valid goal of encouraging a class of persons to do what they were already legally obligated to do—register for the draft. *See Selective Service*, 468 U.S. at 860, 104 S.Ct. 3348. As discussed further below, I cannot discern any valid, non-punitive purpose for Congress enacting the legislation challenged in this case. Further, unlike the plaintiffs affected by the statute at issue in *Selective Service*, plaintiffs here cannot avoid the restrictions imposed upon them. Nothing in the challenged provisions affords plaintiffs an opportunity to overcome the funding ban. *Cf. SBC Commc'ns, Inc. v. FCC*, 154 F.3d 226, 243 (5th Cir.1998) (upholding against

---

**11.** The government also argues that in *Lovett* the ban on plaintiffs' government employment was permanent, and that it was the permanency of the legislative action that made the statute unconstitutional. But, as I address at length below, the year-long duration of the ban does not foreclose a bill of attainder finding, particularly given that even a short deprivation of the opportunity to apply for or receive federal funding has long-term ramifications for plaintiffs.

a bill of attainder challenge a statute that sought to encourage competition in the telecommunications industry by imposing restrictions on a specific group of companies because, *inter alia*, the companies "[would] be allowed to enter each of the affected areas as soon as the statutory criteria regarding competition in their local service markets are met").

Notably, in neither *Flemming* nor *Selective Service* did Congress single out any particular individual or entity for adverse treatment; rather, each statute applied to an entire category of people. Here, in contrast, the congressional deprivation is imposed only on ACORN and its affiliates. *See Flemming*, 363 U.S. at 619, 80 S.Ct. 1367 (reasoning that, even if the legislative history were read "as evidencing Congress' concern with the grounds [of prior Communist party membership], rather than the fact, of deportation," "[t]his would still be a far cry from the situations involved in [prior Supreme Court cases] where the legislation was on its face aimed at particular individuals"); *Nixon*, 433 U.S. at 485, 97 S.Ct. 2777 (Stevens, J. concurring) (stating that "[i]t has been held permissible for Congress to deprive Communist deportees, as a group, of their social security benefits, but it would surely be a bill of attainder for Congress to deprive a single, named individual of the same benefit.... The very specificity would mark it as punishment, for there is rarely any valid reason for such narrow legislation[.]").

■ Accordingly, a close reading of the cases indicates that a deprivation of the opportunity to apply for funding in fact fits comfortably within the definition of "punishment" for bill of attainder purposes.

### B. *The Functional Test*

I next consider whether the challenged provisions further non-punitive legislative purposes in light of the type and severity of the burdens they impose.

The Court of Appeals for the Second Circuit explored this factor at length in *Consolidated Edison of New York, Inc. v. Pataki*, in which the Court concluded that an act of the New York state legislature constituted an unconstitutional bill of attainder under Article I, Section 10 of the Constitution. 292 F.3d at 345. Based on a finding that Consolidated Edison ("Con Ed") had "failed to exercise reasonable care on behalf of the health, safety and economic interests of its customers," when it failed to promptly replace steam generators it knew to be faulty, and which then failed, the New York legislature passed a law forbidding Con Ed from passing along the costs associated with the outage to the ratepayers. *Id.* at 344–45.

The Second Circuit found that the State had no valid non-punitive reason that justified singling out Con Ed. It rejected the State's argument that the statute had the legitimate non-punitive purpose of preventing innocent ratepayers from paying for Con Ed's mistakes. The statute, the Court concluded, did more than simply redistribute or minimize costs. Rather, the "type and severity of the burdens imposed" belied the legitimacy of the regulatory justification. *Id.* at 353. There was little question that Con Ed could have passed on the cost of obtaining power elsewhere if it had replaced the generators during a *scheduled* outage; "[w]hat then," the Court asked, "other than punishment can justify forcing Con Ed to absorb these same costs after the accidental outage?" *Id.* Further, the legislature could have enacted "less burdensome alternatives" to achieve its legitimate objectives, such as excluding "those substantial costs that would have been incurred absent misconduct on Con Ed's part." *Id.* at 354.

In attempting to articulate a non-punitive rationale for the challenged provisions,

the government now presses the same non-punitive justifications as it did in *ACORN I*. The government again argues that, because there was no formal congressional finding of misconduct against ACORN, the year-long bar on all funding to ACORN is not punitive. But, as in *Con Ed*, the nature of the bar and the context within which it occurred make it unmistakable that Congress determined ACORN's guilt before defunding it. *See Nixon*, 433 U.S. at 480, 97 S.Ct. 2777 (noting that a "formal legislative announcement of moral blameworthiness or punishment" is not a necessary element of a bill of attainder). In sum, wholly apart from the vociferous comments by various members of Congress as to ACORN's criminality and fraud, as described below, no reasonable observer could suppose that such severe action would have been taken in the absence of a conclusion that misconduct had occurred. *See Con Ed*, 292 F.3d at 349 (noting that "[a]nother indispensible element of a bill of attainder is its retrospective focus: it defines past conduct as wrongdoing and then imposes punishment on that past conduct.").

The government also argues that Congress withheld funds from plaintiffs for the non-punitive reason of protecting "the public fisc," not to penalize ACORN for past wrongdoing. But Congress's interest in preventing *future* misconduct does not render the statute regulatory rather than punitive. Deterring future misconduct, as *Con Ed* stressed, is a traditional justification of punishment *See Con Ed*, 292 F.3d at 353; *see also Brown*, 381 U.S. at 458, 85

S.Ct. 1707; *Selective Service*, 468 U.S. at 851–52, 104 S.Ct. 3348 ("Punishment is not limited solely to retribution for past events, but may involve deprivations inflicted to deter future misconduct."). Incapacitation, too, is often a reason for punishment *But cf. SeaRiver Maritime Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir.2002) (upholding a statute restricting "tank vessels that have spilled more than 1,000,000 gallons of oil into the marine environment" from operating in Prince William Sound against a bill of attainder challenge because the statute had a non-punitive purpose.).

Turning to consideration of the "type and severity" of the burdens the challenged provisions impose, the government argues that the appropriations provisions, unlike the "permanent" ban on funding in *Lovett*, are only "temporary." But the year-long duration of the ban does not foreclose a bill of attainder finding. As a preliminary matter, it is far from settled that punishment must be a permanent measure. *See Brown*, 381 U.S. at 447, 85 S.Ct. 1707 (noting that the Bill of Attainder clause bars legislative punishment "of any form or severity"). If Congress determined that a person was to be jailed for a year and then released, the government would be hard pressed to argue that only a life sentence would constitute "punishment." [12]

And, contrary to the government's contention, the challenged provisions are no less permanent than the statute at issue in *Con Ed*. The New York legislature deprived Con Ed of the opportunity to recover the costs of its outage through a one-

---

**12.** The government's argument also ignores the fact that appropriations acts, even if renewed indefinitely, are by their very nature limited in time; if plaintiffs are precluded from challenging a funding restriction on the basis of the "temporariness" of a year-long appropriations provision, plaintiffs could never challenge a ban in an appropriations bill that was renewed indefinitely. Such a situation would raise difficulties akin to those controversies the Supreme Court has found "capable of repetition, yet evading review" in the mootness context. *See, e.g., Davis v. Fed. Election Comm'n*, —— U.S. ——, 128 S.Ct. 2759, 2769–70, 171 L.Ed.2d 737 (2008).

time rate increase, but Con Ed was not precluded from recovering costs of *future* outages from ratepayers. In the same way, the ban on ACORN may last only one year, but ACORN is permanently deprived of the opportunity to apply for Fiscal Year 2010 funding. This may affect multi-year grants and contracts (although such grants and contracts may be contingent on congressional appropriations in another fiscal year). In addition, the backward-looking provision in the HUD appropriations act, imposing limits on funding ACORN out of available appropriations from prior acts, also extends the impact beyond a single appropriations year. *See supra* note 5. Most importantly, although the government's brief refers to the limitations as "temporary," as "suspensions of funding," and as a "moratorium" on funding, plaintiffs are permanently harmed now even if their opportunity to apply for federal funding is restored in the future.

One difference between Section 163 and the newly-challenged provisions features prominently in one of the government's proffered non-punitive rationales: the inclusion in Section 535 of a directive to GAO to investigate grants to ACORN. Citing this investigation, the government argues mat the challenged provisions "further the non-punitive legislative purposes of investigating the possible misuse of federal funds and exercising oversight of executive branch agencies' expenditure of funds." Gov't's Mem. in Opp. to Pls.' Motion for Perm. Relief 15. The government points to the investigation as evidence that Congress's rationale in enacting these various provisions was not to punish plaintiffs, but rather to learn about their activities to be able to determine whether to fund them in the 2011 appropriations year.

This argument rests on the faulty assumption that Congress can constitutionally rely on the results of a congressional investigation to single plaintiffs out and to deny them funding. Congress is entitled to investigate ACORN and to determine whether the executive agencies with whom plaintiffs have contracted have properly held them to account. But Congress could not rely on the negative results of a congressional or executive report as a rationale to impose a broad, punitive funding ban on a specific, named organization; explicit non-judicial findings of guilt would exacerbate, rather than mitigate, the punitive nature of the challenged provisions. *See De Veau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) ("The distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt"). The same is true for the variety of investigations of ACORN the government relies on to justify Congress's action. Similarly, legislative determinations of plaintiffs' wrongdoing did not save the statutes in *Lovett* or *Con Ed.*

In any event, the inclusion of a direction to the GAO to investigate does not support the plausibility of the government's rationale. To the extent the government argues that the investigation evidences Congress's non-punitive purpose of investigating the possible misuse of federal funds, nothing in the challenged legislation, or in Section 535, indicates that the investigation ordered by Congress is linked to the bans on funding in the way that government counsel suggests. Nor does anything in the legislative record support this rationale; the government has cited no legislator who articulated it; [13]

---

13. The government notes that two members of the House, Representative Lamar Smith and Representative Darrell Issa, wrote a letter to the GAO requesting an investigation into

ACORN's use of federal funds, as did twenty senators. *See, e.g.,* Letter from Congressmen Smith and Issa to The Honorable Gene Dodaro, Acting Comptroller General (Sept. 23,

and in fact, the proponent of the investigation, Senator Richard Durbin, argued *against* the funding prohibitions.[14] Further, as noted previously, the unavailability of any means for ACORN to overcome the funding ban if the investigation report is favorable underscores the lack of a connection between the burdens of the statute and Congress's purpose in enacting it.

Moreover, the government ignores the existence of comprehensive regulations promulgated to address the very concerns Congress has expressed about ACORN. For example, the Code of Federal Regulations establishes a formal process for determining when federal contractors can be suspended or debarred. *See, e.g.*, 2 C.F.R. Ch. 1, Part 180. Subpart G of this part provides that a suspending official may impose suspension after considering a range of factors; the official can even take "immediate action" if "needed to protect the public interest." *See* 2 C.F.R. § 180.705 ("In deciding whether immediate action is needed to protect the public interest, the suspending official has wide discretion. . . ."). By noting these regulations, I do not suggest that Congress is precluded from exercising its oversight powers if it is concerned that agencies are not adequately implementing their authority. But the existence of these regulations militates against the need for draconian, emergency action by Congress.

That ACORN alone was singled out for adverse treatment further belies any claim that non-punitive reasons explain the challenged provisions. It is true that not every statute directed at a single individual or entity will necessarily be a bill of attainder. In *Nixon*, for example, the Supreme Court found that a statute naming former President Nixon was not a bill of attainder. The specific mention of his name was "easily explained by the fact that at the time of the Act's passage, only his [papers and recordings] demanded immediate attention." 433 U.S. at 472, 97 S.Ct. 2777. Nixon, and only Nixon, had entered into an agreement with a depository which called for destruction of the materials upon Nixon's death. Thus, Nixon "constituted a legitimate class of one, and this provide[d] a basis for Congress' decision to proceed with dispatch with respect to his materials

---

2009); Letter from Twenty Senators to Acting Comptroller General Dodaro (Sept. 22, 2009).

But, as plaintiffs point out, Representatives Smith and Issa wrote their letter only after they had voted to prohibit ACORN from receiving federal funds on a *permanent* basis. *See* Defund ACORN Act, H.R. 3571, 111th Congress (passed in the House September 17, 2009). Moreover, several of the senators requesting an investigation had previously introduced Senate Bill 1687, the Protect Taxpayers from ACORN Act, sponsored by Senator Mike Johanns, which would also have permanently prohibited ACORN and ACORN affiliates from receiving any federal funding. And, indeed, the same members of Congress voted for the funding prohibition in the Department of Interior's appropriations act before they knew whether the GAO would investigate at all.

**14.** In proposing the investigation, Senator Durbin stated that "[W]e are seeing in Con-

gress an effort to punish ACORN that goes beyond any experience I can recall in the time I have been on Capitol Hill. We have put ourselves—with some of the pending amendments—in the position of prosecutor, judge and jury." 155 Cong. Rec. S10181, S10211 (daily ed. Oct. 7, 2009). He continued:

> Mr. President, I went to one of these old-fashioned law schools. We believed that first you have the trial, then you have the hanging. But, unfortunately, when it comes to this organization, there has been a summary execution order issued before the trial. I think that is wrong. In America, you have a trial before a hanging, no matter how guilty the party may appear. And you don't necessarily penalize an entire organization because of the sins or crimes of a limited number of employees. First, we should find out the facts.
> *Id.*

while accepting the status of his predecessors' papers and ordering the further consideration of generalized standards to govern his successors." *Id.*

Similarly, the D.C. Circuit in *BellSouth Corp. v. FCC,* 162 F.3d 678 (D.C.Cir. 1998), held that a statute that specifically restricted the operations of the Bell Operating Companies ("BOCs") in order to promote competition in the telecommunications market was not a bill of attainder because of the "unique infrastructure controlled by the BOCs" which allowed them to exercise monopoly power. Because of this "unique infrastructure," the D.C. Circuit concluded that the differential treatment was "neither suggestive of punitive purpose nor particularly suspicious." *Id.* at 689–90 (internal quotation marks omitted). The Fifth Circuit, addressing another challenge to the same legislation, similarly stated that the "[BOCs] can exercise bottleneck control over both ends of a [long distance] telephone call in a higher fraction of cases" than other companies, and that it was therefore "rational to subject them to additional burdens in order to achieve the overall goal of competitive local and long distance service." *See SBC Commc'ns Inc.,* 154 F.3d at 243.

The government has offered no similarly unique reason to treat ACORN differently from other contractors accused of serious misconduct and to bar ACORN from federal funding without either a judicial trial or the administrative process applicable to all other government contractors. In *Con Ed,* the Second Circuit established a rigorous standard for evaluating legislatures' purported justifications in the bill of attainder context New York State argued numerous seemingly non-punitive reasons for the legislation in question, including deterrence and protection of public safety. The Circuit examined each rationale closely and systematically, and it found each one lacking a non-punitive purpose. As in

*Con Ed,* none of the government's justifications stand up to scrutiny. I can discern no non-punitive rationale for a congressional ban on plaintiffs, and plaintiffs alone, from federal funding.

### C. *Legislative History*

■ The third, and final, element in determining whether an act is punitive is legislative intent. *See Selective Service,* 468 U.S. at 852, 104 S.Ct. 3348. "The legislative record by itself is insufficient evidence for classifying a statute as a bill of attainder unless the record reflects overwhelmingly a clear legislative intent to punish." *Con Ed,* 292 F.3d at 354. Determining Congress's intent is often a difficult exercise; the stated comments of one legislator do not necessarily represent the unspoken thoughts of others who voted for a bill. Nevertheless, since the Supreme Court instructs that legislative intent is a key part of the framework for determining whether a legislative act is a bill of attainder, I must consider it. *See Nixon,* 433 U.S. at 478, 97 S.Ct. 2777.

Here, the task is made easier because the government fails to offer any legislative history that would indicate a nonpunitive intent In *ACORN I,* in justifying Section 163, the government relied on the statements of Senator Mike Johanns, who introduced all of the challenged provisions in this case. For example, the government cited Senator Johanns's statement, in support of the provision defunding ACORN in the 2010 Department of Interior's appropriations act, that he was proposing the legislation "to defend taxpayers against waste, fraud, and abuse." 155 Cong. Rec. S9517 (daily ed. Sept. 17, 2009). The government also relied on Senator Johanns's statement that ACORN was "in an absolute free fall when it comes to allegations of illegal activity" and was "besieged by allegations of fraud and corruption and employee wrongdoing." *Id.* Such state-

ments require an implicit finding of wrongdoing by plaintiffs; protection of taxpayers' money is a logical justification for a funding ban only if wrongdoing is assumed.[15]

When introducing the challenged 2010 appropriations provisions, Senator Johanns made it clear that the purpose of the new provisions was to continue the prohibition enacted in Section 163. He explained that, because the Continuing Resolution was about to expire, Congress "need[s] to continue passing this amendment; therefore, [he] need[s] to continue to offer it." Senator Johanns also noted that he "do[es] have a piece of legislation pending that would take care of this across the Federal system, but that has not come to a vote yet. So I am offering today this amendment on ACORN. This amendment will continue to protect taxpayer dollars." 155 Cong. Rec. S11313 (daily ed. Nov. 10, 2009); *see also* 155 Cong. Rec. S9317 (daily ed. Sept. 14, 2009) (statement of Sen. Johanns) ("Somebody has to go after ACORN. Madam President, I suggest this afternoon that 'somebody' is each and every Member of the Senate.").

Statements by other legislators echoed the punitive purpose of the legislation. *See, e.g.,* 155 Cong. Rec. S9314 (daily ed. Sept. 14, 2009) (statement of Sen. Kit

Bond) (stating that ACORN's problem is not one of "a handful of rogue employees, but, regrettably, an endemic systemwide culture of fraud and abuse" and that "Congress has the opportunity to end this relationship now"). In addition, the staff of Representative Darrell Issa authored an 88–page report entitled "Is ACORN Intentionally Structured as a Criminal Enterprise?", which states that "ACORN has repeatedly and deliberately engaged in systemic fraud" and accuses ACORN of conspiring to use taxpayer funds for partisan purposes.[16] The government correctly notes that the Issa Report was authored solely by Representative Issa's office and was not commissioned by Congress. Nevertheless, because Senator Johanns himself requested that its executive summary be entered into the congressional record, the Issa Report is relevant to this inquiry. *See* 155 Cong. Rec. S9309 (daily ed. Sept. 14, 2009) (statement of Sen. Johanns introducing Issa Report in support of what would become Section 418 of the HUD appropriations bill).

Without more, the legislative history would not be enough to render the legislation a bill of attainder. But these statements underline the punitive nature of the legislation. *See Con Ed,* 292 F.3d at 355 ("[T]he stated intent of at least some legis-

---

**15.** At least one representative, Representative Rush Holt, voiced his concern that Section 163 was a bill of attainder. *See* 115 Cong. Rec. H9975 (daily ed. Sept. 25, 2009). In his comments, Rep. Holt referenced a report from the Congressional Research Service. This report, which was written regarding a different bill, "the Defund ACORN Act," which has not been enacted, analyzed that bill and concluded that "a court would have a sufficient basis to overcome the presumption of constitutionality and find that the Defund ACORN Act violates the prohibition against bills of attainder." Kenneth Thomas, Congressional Research Service Report for Congress: The Proposed "Defund ACORN Act": Is it a "Bill of Attainder"? (Sept. 22, 2009).

**16.** With respect to plaintiffs' allegations that the challenged provisions are intended to punish ACORN for its impermissible partisanship, a statement Representative Issa made in response to OLC's October 23, 2009 memorandum construing the scope of Section 163 is noteworthy. In that statement, Representative Issa accused OLC of "old-fashioned cronyism" and stated that "[t]axpayers should not have to continue subsidizing a criminal enterprise that helped Barack Obama get elected President." Press Release, Rep. Darrell Issa, Issa Blasts Administrative Decision to Fund ACORN—Recks of Political Cronyism (Nov. 27, 2009).

lators—most notably one of the floor managers of the legislation—to punish Con Ed reinforces our independent conclusion that a substantial part of the legislation cannot be justified by any legislative purpose but punishment.").

The Supreme Court counseled in *Flemming* that each attainder case "turn[s] on its own highly particularized context." *Flemming,* 363 U.S. at 616, 80 S.Ct. 1367. Here, as in *Lovett,* Congress deprived plaintiffs of an opportunity available to all others. Especially where plaintiffs have received federal funds from many federal grants and contracts over the years, it cannot be said that such deprivation is anything short of punishment as that has been understood in the bill of attainder cases. The challenged provisions, by singling out ACORN and its affiliates for severe, sweeping restrictions, constitute punishment under the three factors the Supreme Court has articulated for making this determination.[17]

## II. *Remedies*
### A. *Standing/Remedies As To Certain Defendants*

■ Before considering particular remedies, I address the government's arguments that the court lacks jurisdiction to award any remedy against certain defendants. The government relies on Article III's case-or-controversy requirement, which limits federal jurisdiction to actual, ongoing controversies between the parties. *See Northwestern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). The government does not challenge plaintiffs' standing against the United States and the Secretary of HUD, but raises issues as to the remaining defendants.

In essence, the government claims that plaintiffs have no standing as to two categories of named defendants. The first category of defendants consists of the heads of three of the government departments/agencies whose funds ACORN is barred from receiving: the Department of Defense, the EPA, and the Department of Commerce. The government contends that plaintiffs cannot point to any funding they might receive from these three that is affected by the challenged provisions. The second category is comprised of the heads of OMB and the Department of the Treasury, because, the government contends, neither enforces the restrictions on funding.

### i. *Department of Defense, EPA, and Department of Commerce*

■ The challenged provisions include bans on funding from the Defense Department, the EPA, and the Commerce Department. It is not disputed that plaintiffs have received funding from the EPA, either directly or indirectly, and that they have an interest in future funding from both the EPA and Commerce. The defendants simply argue that ACORN cannot identify a specific grant from the EPA or Commerce that ACORN is being deprived of at the moment; plaintiffs dispute this contention, but the parties' disagreements as to the particulars of a few specific grant opportunities are immaterial. There is no dispute that the funding prohibitions bar ACORN and its affiliates from obtaining federal funding either directly from a grant, or indirectly as a subcontractor, from the EPA or the Commerce Department. Plaintiffs have never sought funding from the Department of Defense and agree that they have no expectation of seeking funding from that Department.

---

**17.** Because I find the challenged provisions unconstitutional under the Bill of Attainder Clause, I do not reach plaintiffs' claims under

the First Amendment and the Due Process Clause.

■ But even where there is no *direct* economic injury, reputational injury, as the government acknowledges, can be an injury-in-fact for standing purposes. In *Gully v. National Credit Union Administration Board,* 341 F.3d 155, 162 (2d Cir.2003), for example, the Second Circuit concluded that the plaintiff had standing to challenge a ruling of misconduct, even though the reprimand was not accompanied by a suspension of any kind, because "[i]t is self-evident that Gully's reputation will be blackened by the Board's finding of misconduct and unfitness." *Id.* Similarly, in *Foretich v. United States,* 351 F.3d 1198 (D.C.Cir.2003), the D.C. Circuit considered whether a plaintiff could challenge as a bill of attainder a statute that deprived him of his child visitation rights, even though his child was eighteen, and the statute no longer had any practical effect on his right to see her. The D.C. Circuit concluded that his reputational injuries formed the basis for standing, reasoning that "Congress's act of judging Dr. Foretich and legislating against him on the basis of that judgment—the very things that, as we will see, render the Act an unconstitutional bill of attainder—directly give rise to a cognizable injury to his reputation...." *Id.* at 1213.

The primary argument the government makes in opposition to reputational standing in this case is that plaintiffs' own highly publicized misdeeds, and not the challenged provisions, were the cause of any reputational harms, and that, consequently, judicial relief would not remedy the damage. In *Foretich,* the D.C. Circuit rejected that argument for reasons equally applicable to this case. The court acknowledged that "[i]t may be true ... that the damage to Dr. Foretich's reputation comes in part from the publicity surrounding the custody dispute and [his ex-wife's] allegations, not solely from the [challenged statute]." But

[T]his misses the point The Act itself has caused significant harm to Dr. Foretich. Therefore, by vindicating Dr. Foretich's assertion that Congress unfairly and unlawfully rendered a judgment as to his character and fitness as a father, declaratory relief will provide a significant measure of redress sufficient to satisfy the requirements of Article III standing. Here, a decision declaring the Act unlawful would make clear that Congress was wrong to pass judgment on Dr. Foretich and wrong to single him out for punishment on the basis of that judgment.

*Id* at 1216. Similarly, in *Gully,* the Second Circuit characterized as "facile" the government's argument that the reprimand itself had not caused plaintiff's injuries. There, the Circuit wrote that "[i]t is the Board's *determination,* not Gully's reprehensible conduct, that has sullied her reputation in the credit union industry...." *Gully,* 341 F.3d at 162.

The same reasoning applies here; plaintiffs have suffered from the congressional determination of plaintiffs' guilt, and relief in this action "would make clear that Congress was wrong to pass judgment on [plaintiffs] and wrong to single [them] out for punishment on the basis of that judgment" *Foretich,* 351 F.3d at 1216. Moreover, the record establishes that the reputational injury has an economic component. The challenged legislation has not only barred ACORN from federal funding but has also affected ACORN's ability to obtain funding from non-governmental entities fearful of being tainted—because of the legislation—as an affiliate of ACORN. Accordingly, even apart from plaintiffs' direct economic injuries, their reputational injuries provide an independent basis not only for standing against all of the defendants, but also for relief against them.

### ii. *OMB and the Department of the Treasury*

██ The government asserts that the Director of OMB and the Secretary of the Treasury are not properly-named ˙ defendants on the ground that neither enforces the challenged provisions. This argument takes too narrow a view of these agencies' roles in the federal appropriations process. OMB's acknowledged practice is to notify agencies of recently-enacted provisions of broad importance, as illustrated by OMB's issuance of a memorandum after Section 163 was passed. Because that memorandum is one of the primary sources of plaintiffs' reputational harms, and considering OMB's continuing responsibility to explain appropriations provisions to agencies, plaintiffs have sufficiently alleged an injury-in-fact to support standing against the OMB's Director. As for the Treasury Department, it is responsible for disbursing federal funds, which "may not be disbursed or drawn down from the treasury of the United States unless authorized in accordance with an appropriation act." Decl. of Rita Bratcher, Gov't's Mem. of Law in Opp. to Mot. for Perm. Relief, Ex. B. Although the certifying officials of grant-making agencies may have the primary role in determining whether a disbursement is authorized, the plain language of the challenged provisions prohibits the Treasury Department as the disbursing agency from "providing" or "distributing" funds to ACORN, and provides a basis for standing against the Secretary of the Treasury.

Both OMB and the Department of the Treasury therefore play key roles in administering the appropriations process, and the government has offered no sound reason not to include all agencies that participate in enforcing the unconstitutional provisions, In fact, when enjoining the United States, the court is required to name all officials responsible for compliance with the injunction. Here that includes the Director of OMB and the Secretary of the Treasury. *See* 5 U.S.C. § 702 ("The United States may be named as a defendant in [a challenge to agency action or inaction seeking relief other than monetary damages], and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.").

### B. *Availability of Permanent Relief Against Section 163*

Because Section 163 has now expired, the government argues that a judgment that Section 163 is unconstitutional would not offer plaintiffs any relief. The expiration of the Continuing Resolution, however, did not end Section 163's impact on plaintiffs. As described above, OMB sent a memo to every federal agency in Section 163's wake, informing the agencies that Congress had cut off funding to plaintiffs, and directing them to inform their grantees, and their grantees' subcontractors, of the funding ban on plaintiffs. The reach of this memo was broad, and its effect, lasting. For example, the EPA sent an email to nearly all EPA financial assistance recipients and procurement contractors informing them of the broad scope of the funding prohibitions. Following *ACORN I,* OMB did send an email to all federal agencies' general counsels informing them of the injunction entered in *ACORN I* and that the government was considering appeal, but OMB did not direct them to inform their agencies, grantees, and grantees' subcontractors of this court's ruling. The reputational harm, therefore, continues, the original advice from OMB to the hundreds, if not thousands, of recipients of that advice has never been rescinded.[18]

---

**18.** The government has separately moved to vacate the December 11, 2009 Injunction and

## C. *Declaratory and Injunctive Relief*

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought;" 28 U.S.C. § 2201; *see also* Fed.R.Civ.P. 57. For the reasons explained above, I now direct entry of a declaratory judgment that the challenged provisions are unconstitutional because they violate the Bill of Attainder Clause.

■■■■ In addition to the declaratory judgment, plaintiffs seek a permanent injunction to undo the damage the challenged provisions are causing. "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir.2006) (internal quotation marks omitted). Plaintiffs have prevailed on their bill of attainder claim. As for irreparable harm, it is undisputed that prior to the funding ban, plaintiffs had received significant amounts of federal funding, either directly or indirectly as subcontractors; that grants with the government have been suspended; and that they cannot receive renewals or new grants under the challenged legislation.[19] Because the government's sovereign immunity prevents plaintiffs from bringing suit against the government for monetary damages for these injuries, these harms are, by definition, irreparable.

■■■ Putting aside the role of sovereign immunity in barring the recovery of damages in this case, and any other limitations on the recovery of damages by government contractors where sovereign immunity has been waived, the amount of money plaintiffs might have been awarded had they been allowed to compete for contracts is, as the government acknowledges, impossible to calculate. *See Lion Raisins, Inc. v. United States*, 52 Fed.Cl. 115, 119–20 (Fed.Cl.2002) (noting that injunctive relief is "the most common remedy" for a contractor wrongfully, suspended from bidding on government contracts, and that "the specter of lost profits often constitutes the irreparable harm upon which injunctive relief is based"). Even in nonconstitutional cases that involve suspension or debarment from federal contracting, courts have granted injunctive relief where money damages will not be available and where the contractor has made a sufficient showing on the merits of its claim. *See, e.g., Alf v. Donley*, 666 F.Supp.2d 60, 70

Order, referred to in this opinion as *ACORN I*, on the ground that the preliminary injunction became moot before the government had the opportunity to appeal. The government takes the position that the subject of the decision, Section 163 of the Continuing Resolution, was "without effect" through "happenstance" as the Continuing Resolution had expired on its own terms on December 18, 2009.

The government's motion to vacate is denied. As described in the text, the expiration of the Continuing Resolution did not end Section 163's impact on plaintiffs. In *ACORN I*, as here, I concluded that Congress made a determination of plaintiffs' guilt in its enactment of Section 163. Like Dr. Foretich, discussed above, plaintiffs suffered a reputational injury that continues regardless of whether Section 163 continues to cut off any funds to plaintiffs. For that reason, plaintiffs' claims relating to Section 163 survive its expiration, and there is no basis for vacating *ACORN I* as moot. Of course, the relief to be entered today will supersede the decision in *ACORN I*, which was limited to preliminary relief.

19. Only because of the OLC Memo of October 23, 2009, described above, which raised the possibility of a bill of attainder issue if they were not paid, were plaintiffs paid on the suspended contracts for work they had already performed.

(D.D.C.2009) (taking into account the plaintiff's inability to recoup lost income because of sovereign immunity as a factor in finding irreparable harm). A finding of significant violation of constitutional rights also supports the finding of irreparable harm. *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *see also* 11A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed.2009) (same).

In addition to their irreparable economic harms, plaintiffs have also established reputational injuries for which they can never recover damages at law from the defendants. All of these injuries may continue in the absence of injunctive relief from this court. In determining the nature of the injunctive relief to be awarded, I have considered the acknowledged role of OMB in explaining appropriations provisions to federal agencies, as exemplified by its issuance of the Section 163 memorandum. To date OMB has not rescinded that memorandum. Therefore, injunctive relief will issue to assure that, so far as possible, the harms caused by the unconstitutional legislation will be undone.

## CONCLUSION

Plaintiffs have prevailed on their bill of attainder claim. They have also established irreparable harm and the need for both declaratory and injunctive relief. Therefore plaintiffs' motion for declaratory relief and a permanent injunction is GRANTED. The government's "cross-motion to dismiss and for summary judgment" is DENIED. The government's motion to vacate *ACORN I* DENIED.

A judgment in the following form shall issue: It is hereby

**DECLARED** that, pursuant to Article I, Section 9, of the United States Constitution, the following Acts of Congress are unconstitutional: The Continuing Appropriations Resolution, 2010, Public Law 111–68, Division B, Section 163; the Department of the Interior, Environment, and Related Agencies Appropriations Act of 2010, Public Law 111–88, Division A, Section 427; Consolidated Appropriations Act of 2010, Public Law 111–117, Division A, Section 418; Consolidated Appropriations Act of 2010, Public Law 111–117, Division B, Section 534; Consolidated Appropriations Act of 2010, Public Law 111–117, Division E, Section 511; and the Department of Defense Appropriations Act of 2010, Public Law 111–118, Division A, Section 8123.

An injunction in the following form shall issue:

Defendants the **UNITED STATES OF AMERICA; SHAUN DONOVAN,** in his official capacity as Secretary of the Department of Housing and Urban Development; **PETER ORSZAG,** in his official capacity as Director of the Office of Management and Budget; **TIMOTHY GEITHNER,** in his official capacity as Secretary of the Department of Treasury of the United States; **LISA P. JACKSON,** in her official capacity as Administrator of the Environmental Protection Agency; **GARY LOCKE,** in his official capacity as Secretary of Commerce; and **ROBERT GATES,** in his official capacity as Secretary of Defense; and all those acting in concert with them, are hereby permanently **ENJOINED** from enforcing the Department of the Interior, Environment, and Related Agencies Appropriations Act of 2010, Public Law 111–88, Division A, Section 427; Consolidated Appropriations Act of 2010, Public Law 111–117,

Division A, Section 418; Consolidated Appropriations Act of 2010, Public Law 111–117, Division B, Section 534; Consolidated Appropriations Act of 2010, Public Law 111–117, Division E, Section 511; and the Department of Defense Appropriations Act of 2010, Public Law 111–118, Division A, Section 8123; and Defendant **PETER ORSZAG,** in his official capacity as Director of the Office of Management and Budget, is hereby permanently

(1) **ENJOINED** from instructing or advising federal agencies to enforce any of the legislative provisions declared unconstitutional by this court;

(2) **ENJOINED** to officially rescind the October 7, 2009 OMB memorandum entitled "Memorandum for the Heads of Executive Departments and Agencies" providing "[g]uidance on [S]ection 163 of the Continuing Resolution regarding the Association of Community Organizations for Reform Now (ACORN)" ("the OMB Memorandum");

(3) **ENJOINED** (a) to advise all federal agencies to whom he or his agents sent the OMB Memorandum that the legislative provisions which are the subject of this injunction have been declared unconstitutional; and (b) to instruct all federal agencies that they should advise their contractors or grantees that those legislative provisions have been declared unconstitutional by this court.

**SO ORDERED.**